IN THE UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

**ELAINE H. SNOW**,  3:10-cv-06249-KI

        Plaintiff,  OPINION AND ORDER

  v.

**MICHAEL J. ASTRUE, Commissioner of Social Security**,

        Defendant.

    Michael A. Halliday
    Mills Jacobson Halliday, PC
    715 Commercial St. NE
    Salem, OR 97301

        Attorney for Plaintiff

Page 1 - OPINION AND ORDER

Dwight C. Holton
United States Attorney
District of Oregon
Adrian L. Brown
Assistant United States Attorney
1000 S.W. Third Ave., Suite 600
Portland, OR 97204

Leisa A. Wolf
Special Assistant United States Attorney
Office of the General Counsel
Social Security Administration
701 Fifth Ave., Suite 2900 M/S 221A
Seattle, WA 98104-7075

    Attorneys for Defendant

KING, Judge:

Plaintiff Elaine Snow brings this action pursuant to section 205(g) of the Social Security Act, as amended, 42 U.S.C. § 405(g), to obtain judicial review of a final decision of the Commissioner denying plaintiff's application for disability insurance benefits ("DIB"). I affirm the decision of the Commissioner.

## BACKGROUND

Snow filed an application for DIB on November 2, 2005. The application was denied initially and upon reconsideration. After a timely request for a hearing, Snow, represented by counsel, appeared and testified before an Administrative Law Judge ("ALJ") on April 16, 2008.

On July 18, 2008, the ALJ issued a decision finding Snow not disabled within the meaning of the Act and therefore not entitled to benefits. This decision became the final decision of the Commissioner when the Appeals Council declined to review the decision of the ALJ on July 11, 2010.

Page 2 - OPINION AND ORDER

**DISABILITY ANALYSIS**

The Social Security Act (the "Act") provides for payment of disability insurance benefits to people who have contributed to the Social Security program and who suffer from a physical or mental disability. 42 U.S.C. § 423(a)(1). In addition, under the Act, supplemental security income benefits may be available to individuals who are age 65 or over, blind, or disabled, but who do not have insured status under the Act. 42 U.S.C. § 1382(a).

The claimant must demonstrate an inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to cause death or to last for a continuous period of at least twelve months. 42 U.S.C. §§ 423(d)(1)(A) and 1382c(a)(3)(A). An individual will be determined to be disabled only if his physical or mental impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy. 42 U.S.C. §§ 423(d)(2)(A) and 1382c(a)(3)(B).

The Commissioner has established a five-step sequential evaluation process for determining if a person is eligible for either DIB or SSI due to disability. The evaluation is carried out by the ALJ. The claimant has the burden of proof on the first four steps. Parra v. Astrue, 481 F.3d 742, 746 (9th Cir. 2007), cert. denied, 128 S. Ct. 1068 (2008); 20 C.F.R. §§ 404.1520 and 416.920. First, the ALJ determines whether the claimant is engaged in "substantial gainful activity." If the claimant is engaged in such activity, disability benefits are denied. Otherwise, the ALJ proceeds to step two and determines whether the claimant has a medically severe impairment or combination of impairments. A severe impairment is one "which

significantly limits [the claimant's] physical or mental ability to do basic work activities." 20 C.F.R. §§ 404.1520(c) and 416.920(c).  If the claimant does not have a severe impairment or combination of impairments, disability benefits are denied.

If the impairment is severe, the ALJ proceeds to the third step to determine whether the impairment is equivalent to one of a number of listed impairments that the Commissioner acknowledges are so severe as to preclude substantial gainful activity.  20 C.F.R. §§ 404.1520(d) and 416.920(d).  If the impairment meets or equals one of the listed impairments, the claimant is conclusively presumed to be disabled.  If the impairment is not one that is presumed to be disabling, the ALJ proceeds to the fourth step to determine whether the impairment prevents the claimant from performing work which the claimant performed in the past.  If the claimant is able to perform work she performed in the past, a finding of "not disabled" is made and disability benefits are denied.  20 C.F.R. §§ 404.1520(e) and 416.920(e).

If the claimant is unable to perform work performed in the past, the ALJ proceeds to the fifth and final step to determine if the claimant can perform other work in the national economy in light of his age, education, and work experience.  The burden shifts to the Commissioner to show what gainful work activities are within the claimant's capabilities.  Parra, 481 F.3d at 746. The claimant is entitled to disability benefits only if he is not able to perform other work.  20 C.F.R. §§ 404.1520(f) and 416.920(f).

## STANDARD OF REVIEW

The court must affirm a denial of benefits if the denial is supported by substantial evidence and is based on correct legal standards.  Bayliss v. Barnhart, 427 F.3d 1211, 1214 n.1 (9th Cir. 2005).  Substantial evidence is more than a "mere scintilla" of the evidence but less than

a preponderance.  Id.  "[T]he Commissioner's findings are upheld if supported by inferences reasonably drawn from the record, and if evidence exists to support more than one rational interpretation, we must defer to the Commissioner's decision."  Batson v. Comm'r of Soc. Sec. Admin., 359 F.3d 1190, 1193 (9th Cir. 2004) (internal citations omitted).

## THE ALJ'S DECISION

The ALJ found Snow suffered from the severe impairment of pustular psoriasis, and that this impairment was not severe enough to meet or medically equal the requirements of any of the impairments listed in 20 C.F.R. § 404, Subpart P, Appendix 1.  The ALJ also concluded that Snow's condition did not affect her ability to perform the full range of physical work, but determined that she should wear close fitting gloves to protect her hands from friction.  Since she had the residual functional capacity to perform the full range of physical work, the ALJ found Snow could return to her past relevant work as an x-ray technician and medical assistant.

## FACTS

Snow alleges disability from multi-chemical sensitivity and toxic encephalopathy beginning February 18, 2005.  Snow, who was 43 years old at the time of her alleged onset of disability, has a high school education and a lengthy work history as an x-ray and medical laboratory technician.  She stopped working February 18, 2005 because she believed her symptoms were associated with her workplace.

Snow first noticed a rash on her hands and feet in 2002, which coincided with her new job at a doctor's office developing x-rays.  She had previously worked as a medical assistant, laboratory manager, and x-ray technician for another employer for approximately ten years.  The

diagnosis initially was eczema and she was provided Protopic, which helped some, although she later reported that the Protopic made the condition worse. Tr. 203; 234.

The rash spread to the heels of her feet, she questioned the diagnosis, and she obtained a second opinion from Debbie Miller, M.D., on February 13, 2003. She told Dr. Miller that the rash first appeared in December 2002. Dr. Miller discussed Snow's job with her, learned that she wiped down the machinery between patients with isopropyl alcohol five to ten times a day and washed with antibacterial soap. The rash looked like a scaley, itchy patch on the palm, spreading to the fingertips. The nail on a left finger had separated from the nail plate. Dr. Miller's impression was dermatitis, although she noted the possibility of psoriasis. Dr. Miller recommended wearing gloves, moisturizing after hand washing, and using Dermatop ointment. A month later, Snow's hands were almost completely clear, but she continued to have a rash on her feet. Snow described glutaraldehyde on the darkroom floor, which transferred to the soles of her feet; Dr. Miller recommended wearing clogs and leaving them at work. In October, Snow's hands and feet had worsened. She was using Desitin ointment, and Dr. Miller recommended wearing double gloves when performing x-ray work.

Snow did not return to Dr. Miller until September 16, 2004, at which time she complained again about the rash on her hands and feet and mentioned concerns about "systemic syndromes involving glutaraldehyde[.]" Tr. 199. Snow was not complaining of asthma or shortness of breath. Dr. Miller recommended that Snow see an allergist and obtain patch testing to confirm whether she was in fact allergic to glutaraldehyde.

Snow filed a workers' compensation claim in September of 2004. She complained of rashes on her hands and feet, as well as lung restriction, bronchial irritation, esophageal irritation,

breathing restrictions, blue lips after working eight hours, joint pain, headaches, sore throat, fatigue, rashes on hands and feet that bled, nausea, and heart palpitations.

Her employer modified her job duties so that she would not have to process films in the darkroom.

Her employer had a telephone conversation with Barry Egener, MD, who explained that he thought Snow had an allergy to, or had contact with, chemicals. He believed Snow could continue to work, particularly since her rash had improved since she stopped developing film in the darkroom.

On October 19, 2004, the Oregon Occupational Safety and Health Division ("OSHA") checked the air quality in the darkroom, sampling for acetic acid, hydroquinone, sulfer dioxide and gluteraldehyde. OSHA reported on November 9 that none of these chemicals were detected in the darkroom or office.

Snow's employer continued to offer her modified duties, but indicated that the temporary position would end on January 30, 2005.

On December 21, 2004, Frances Storrs, M.D. reported that Snow had been seen by the Contact Dermatitis Clinic at OHSU on four separate occasions in December. Dr. Storrs' report indicated Snow mentioned she first experienced the symptoms in August of 2002, about one month after starting her current job. She said that the Desitin cream and gloves had helped her hands, but she thought the room in which she was working was not well-ventilated. In fact, since a fan was placed in the room, she noticed her hand rash had improved. Snow explained to Dr. Storrs that she did not work directly with any chemicals; she ran the x-ray machine, carried the film to the processor, the x-ray film was dry when it went in and dry when it came out of the

processor. The working environment was somewhat dirty, however, with chemical spills or drips on the floor. After testing Snow with various chemicals, including a sample of x-ray films, glutaraldehyde and silver nitrate, Snow showed only an allergy to nickel. Dr. Storrs diagnosed pustular hand dermatitis, most consistent with psoriaris; Dr. Storrs found no evidence of allergic contact dermatitis. She noted that Snow's work might worsen the condition due to friction and recommended Snow take two weeks' vacation to see if her hands improved.

On December 16, 2004, Brent Burton, M.D., M.P.H., a specialist in Occupational and Environmental Toxicology, examined Snow. Snow reported to Dr. Burton that she had attended a continuing education course for radiology technicians and learned that workers could be "sensitized to chemicals in the darkroom." Tr. 234. She realized she was having trouble breathing and was coughing, and her boyfriend informed her that her lips had turned blue on one occasion. She began studying chemicals on the internet and decided she would not go back into the darkroom. Since she stopped working in the darkroom, she thought her condition had improved about 50%. She told Dr. Burton that she liked boating, camping, fishing, gardening, hiking, and hunting. Dr. Burton tested her neurologic health and noted her gait was normal and finger to nose testing was normal. He confirmed she did not have bronchial hyper-reactivity. After discussing her work conditions, Dr. Burton concluded Snow did not have direct contact with any chemical substances and, thus, did not have hand and foot dermatitis. In addition, he noted that inhalation exposure was ruled out; combined with the fact that the OSHA tests were normal, Snow would have developed ocular and upper airway irritant symptoms which "would be unmistakable." He also concluded that because her pulmonary function test was normal, any

"potential exposure to glutaraldehyde or other substances at her workplace did not cause a pulmonary condition or produce a symptomatic respiratory response." Tr. 239. He diagnosed eczema or psoriasis, pending Dr. Storrs patch testing and skin biopsy.

On January 10, 2005, Dr. Egener noted Dr. Storrs' conclusion that the rash was psoriasis, but that friction at work might be exacerbating Snow's condition. He indicated that Snow's employer had installed a ventilation system, that OSHA found undetectable chemical levels, that Snow's pulmonary function test was normal, that skin testing showed an allergy to nickel only, and that biopsy of the skin indicated pustular dermatitis. Dr. Egener opined it would be safe for Snow to return to work, but agreed it made sense to allow her two weeks' vacation to determine whether work worsened her condition.

On January 26, 2005, Snow's workers' compensation claim was denied.

Snow first visited a specialist in immunotoxicology and neurotoxicology, Gunnar Heuser, M.D., Ph.D, on February 22, 2005.

On April 7, 2005, Snow traveled to California again to see Dr. Heuser. In his history, he reported that Snow started working as an x-ray technician in July 2002, that she developed skin problems in August, and her fingernails and toenails started falling off in December. She stopped working February 18, 2005. He reported that Dr. Egener diagnosed contact dermatitis in September 2004, and that patch testing was positive in December 2004. He also reported that an examination of Snow on February 24, 2005 showed she demonstrated neurological abnormalities; she had an increased sway when she closed her eyes, experienced unsteadiness walking on her heels, and unsteadiness when hopping and turning on one foot. A SPECT brain scan on February 23, 2005 showed abnormalities that Dr. Heuser viewed as indicative of

Page 9 - OPINION AND ORDER

chemical and radiation exposure.  A TOVA test on February 24, 2005 indicated possible attention deficit disorder, according to Dr. Heuser, because of its showing of impulsivity.  He concluded the history by opining that "a diagnosis of Dark Room Disease appears justified.  This patient can therefore not return to work."  Tr. 284.  He recommended hyperbaric oxygen therapy.

On April 13, 2005, Dr. Egener concurred with the reports of doctors Storrs and Burton.

On April 26, 2005, Dr. Miller concurred with the diagnoses of doctors Storrs, Burton and Egener.

On December 7, 2005, Dr. Heuser repeated his conclusion that Snow suffered from dark room disease and was "totally disabled" as a result.  Tr. 206.

On January 19, 2006, non-examining consulting physician Neal Berner, MD, reported that Dr. Burton questioned Dr. Heuser's diagnosis.  Dr. Heuser failed to identify a single substance to which Snow may have been exposed, or how her symptoms were related to such exposure.  Dr. Berner believed the SPECT and TOVA tests were unproven and should not play a role in diagnosing any toxicological disease.

On June 12, 2006, Kurt Brewster, M.D., examined Snow as a result of her complaints about multiple-chemical sensitivity.  Dr. Brewster opined, "On the whole, given the fact that she had worked in a similar occupation for 10 years without emergence of symptoms, she has a clearly defined medical condition that is not related to an allergic contact and her overall symptoms appear overly broad and undefined."  Tr. 302.  He concluded that she has an allergy to nickel and a history of pustular psoriasis which may be aggravated by friction.  She need not avoid specific chemicals, but should use gloves as appropriate.

On November 8, 2006, Dr. Heuser reported that Snow suffers from chemical intolerance. He reported that he tested her attention and reaction time, her pulmonary function, and her immune system before and after exposure to a perfume. He concluded the test results "showed convincing evidence that a commonly assumed to be innocuous chemical had pronounced effects on her brain, lungs, and immune system." Tr. 310.

On April 10, 2008, just before her hearing before the ALJ, Dr. Heuser explained his credentials: he had examined thousands of patients after chemical injuries, had published peer reviewed articles about clinical toxicology, and given lectures all over the world. He summed up his "[d]iagnostic [i]mpressions" as follows:

> In my opinion, this patient suffers from toxic encephalopathy which originated with chemical exposure and which is documented with the abnormal brain tests discussed above.
>
> The patient also suffers from reactive airways which were documented with pulmonary function tests before and after chemical exposure.
>
> Finally, the patient suffers from immune dysfunction which was documented with appropriate immune function tests.
>
> As a result of the above conditions, this patient developed significant and disabling chemical intolerance [sensitivity] which was documented with tests outlined above.
>
> In summary, she suffers from multisystem disease with multisystem complaints which were objectively documented.
>
> No cure is available for her disease which I therefore anticipate will continue for years to come if not for her lifetime.
>
> Her disease in my opinion, is totally disabling, meaning that she is unable to function in any job.
>
> No work place these days is devoid of chemicals. That is why her disability is total.

Tr. 320.

After the ALJ's decision Dr. Heuser submitted another letter, dated September 2, 2008, responding to Dr. Burton's opinion and attaching the test results to which he had earlier referred. Dr. Heuser opined that the investigation of Snow's work environment tested for only a handful of chemicals "even though many chemicals must have been present in her work place." Tr. 330. He also suggested that mixtures of chemicals can be toxic, even if individual chemicals are not present in toxic levels. Dr. Heuser defended his use of SPECT scanning and the TOVA test to evaluate brain abnormalities, and defended his diagnosis of dark room disease.

Snow submitted, with her opening brief, a further report from Dr. Heuser dated September 13, 2010 and again attaches the test results to which he earlier referred. In his 2010 report, Dr. Heuser reiterates that the SPECT scan demonstrates Snow's neurotoxic exposure, that the immune testing shows abnormalities seen after toxic chemical exposure, and reports that abnormal immune tests are compatible with a negative patch test. He reiterates that chemical mixtures are harmful and are hard to analyze.

## DISCUSSION

The only two issues presented by Snow's challenge are whether the ALJ properly accepted her treating and examining physicians' diagnosis over Dr. Heuser's diagnosis, and whether the ALJ properly found Snow's testimony not fully credible.

I.      Medical Evidence

The ALJ accepted the evaluations of doctors Storrs, Burton, Egener, Miller and Brewer, which he found to be consistent with each other, over the opinion of Snow's treating specialist, Dr. Heuser.

The weight given to the opinion of a physician depends on whether the physician is a treating physician, an examining physician, or a nonexamining physician. More weight is given to the opinion of a treating physician because the person has a greater opportunity to know and observe the patient as an individual. Orn v. Astrue, 495 F.3d 625, 632 (9th Cir. 2007). If a treating or examining physician's opinion is not contradicted by another physician, the ALJ may only reject it for clear and convincing reasons. Id. (treating physician); Widmark v. Barnhart, 454 F.3d 1063, 1067 (9th Cir. 2006) (examining physician). Even if it is contradicted by another physician, the ALJ may not reject the opinion without providing specific and legitimate reasons supported by substantial evidence in the record. Orn, 495 F.3d at 632; Widmark, 454 F.3d at 1066. The opinion of a nonexamining physician, by itself, is insufficient to constitute substantial evidence to reject the opinion of a treating or examining physician. Widmark, 454 F.3d at 1066 n.2.

Since Dr. Heuser's opinion was contradicted by all of the other physicians who treated and examined Snow, the ALJ was required to give only specific and legitimate reasons for rejecting his opinion. The ALJ noted the following: Dr. Heuser relied on Dr. Egener's initial conclusion that Snow suffered from contact dermatitis, but Dr. Egener later changed his diagnosis; Dr. Heuser stated that Snow's patch testing was positive, but it was only positive for nickel and no other chemicals found in Snow's workplace; the ALJ questioned Dr. Heuser's conclusion that the TOVA test results were abnormal since they showed only a below-normal level for impulsivity; the ALJ found the SPECT brain scan results were very vague and "not diagnostic of any specific medical condition" (Tr. 20); the ALJ noted the absence of the pulmonary function test and immune system test (both were provided later to the Appeals

Council); the neurologic examination that Dr. Heuser found to be abnormal was based on mild swaying with closed eyes, unsteadiness when heel-walking and hopping and turning on one foot, which the ALJ found not to be true "abnormalities" and conflicted with all the other examinations; finally, the American Medical Association and the Center for Disease Control do not recognize multiple chemical sensitivity as a clinical disorder due to the lack of conclusive scientific evidence.

The reasons the ALJ gave easily meet the specific and legitimate threshold and are supported by substantial evidence in the record. An ALJ is not required to accept the opinion of a physician, even a treating physician, if the opinion is "inadequately supported by clinical findings." Batson, 359 F.3d at 1195. The ALJ pointed out a number of reasons why Dr. Heuser's diagnosis was not adequately supported by his clinical findings; specifically, the SPECT brain scan results were vague, the TOVA test results were normal, and the neurological evaluation did not indicate true "abnormalities."

The Appeals Council found no reason to review the ALJ's opinion, even considering the provision of the immune system and pulmonary function test results which had not been provided to the ALJ. Other pulmonary function testing in 2004 and 2006 was normal, as were other blood test results. "The trier of fact and not the reviewing court must resolve conflicts in the evidence, and if the evidence can support either outcome, the court may not substitute its judgment for that of the ALJ." Matney v. Sullivan, 981 F.2d 1016, 1019 (9th Cir. 1992). Further, even if the ALJ had the test results, the ALJ provided other specific and legitimate reasons to question Dr. Heuser's opinion as set forth above. Finally, given the fact that substantial evidence

from five treating and examining physicians supports his decision, I defer to the Commissioner's decision.

  B.  2010 Report

Snow has provided a further report from Dr. Heuser, reiterating his belief that the SPECT scan and immune system function test results confirm his diagnoses of (1) toxic encephalopathy, secondary to chemical exposure at work, (2) immune dysfunction, secondary to chemical exposure at work, and (3) reactive airways, secondary to chemical exposure at work.

Under 42 U.S.C. § 405(g), this court may remand a proceeding "upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding." If the evidence did not exist prior to the Secretary's final decision, good cause exists for the plaintiff's failure to present the evidence. Burton v. Heckler, 724 F.2d 1415, 1418 (9th Cir. 1984). Medical reports generated after an ALJ's decision may be material to a determination of whether the claimant was disabled prior to the date of the adverse decision. Smith v. Bowen, 849 F.2d 1222, 1225 (9th Cir. 1988). To be material, the new evidence offered must bear directly and substantially on the matter in dispute. Burton, 724 F.2d at 1417.

The new evidence consists solely of Dr. Heuser's letter, reiterating his earlier rationale for diagnosing Snow the way he did; consequently, I am not entirely convinced the evidence is properly characterized as "new." The test results provided to the Appeals Council did not compel it to review the ALJ's decision. Dr. Heuser's letter is simply a response to the ALJ's decision and is cumulative of Dr. Heuser's earlier opinions attempting to justify his diagnosis of toxic encephalopathy. Even if the letter is properly considered to be new evidence, I question its

Page 15 - OPINION AND ORDER

value as it comes after the ALJ's unfavorable decision.  See Weetman v. Sullivan, 877 F.2d 20, 23 (9th Cir. 1989) ("opinion is all the less persuasive since it was obtained . . . only after the ALJ issued an adverse determination").  Finally, Dr. Heuser's 2010 letter does nothing to undermine the ALJ's conclusion that the SPECT scan was not diagnostic of any specific medical condition, that the TOVA test was not indicative of attention problems, that Dr. Heuser's physical examination did not reveal any true abnormalities, that the ALJ's decision is supported by five other treating and examining physicians, and that Dr. Heuser neglects to specifically identify any chemical or mix of chemicals to which Snow was exposed that could cause her alleged symptoms.  The 2010 letter does not require this Court to remand.

II.     Snow's Credibility

Snow testified that she quit her job as an x-ray technician due to concerns about her health; she believed the office had poor ventilation.  Her hands and feet broke out and her fingernails and toenails were falling off.  Her daughter noticed she started stuttering, and she started having joint pain, coughing, and nausea.  She testified Dr. Heuser explained to her that the chemicals were "hitting my autonomic nervous system[.]" Tr. 43.  Dr. Heuser gave Snow a prescription for oxygen.  Now, she has a reaction when she goes into stores, and restaurants, and she reacts to fertilizer, cleaning supplies, perfumes, and deodorant.  She immediately experiences restrictive breathing, vomiting, nausea, diarrhea and she will feel the effects for days afterward.  She is also now reacting to processed food.  She believes her symptoms are getting worse.

When deciding whether to accept the subjective symptom testimony of a claimant, the ALJ must perform a two-stage analysis.  In the first stage, the claimant must produce objective medical evidence of one or more impairments which could reasonably be expected to produce

some degree of symptom. Lingenfelter v. Astrue, 504 F.3d 1028, 1036 (9th Cir. 2007). The claimant is not required to show that the impairment could reasonably be expected to cause the severity of the symptom, but only to show that it could reasonably have caused some degree of the symptom. In the second stage of the analysis, the ALJ must assess the credibility of the claimant's testimony regarding the severity of the symptoms. Id. The ALJ "must specifically identify the testimony she or he finds not to be credible and must explain what evidence undermines the testimony." Holohan v. Massanari, 246 F.3d 1195, 1208 (9th Cir. 2001). General findings are insufficient to support an adverse credibility determination and the ALJ must rely on substantial evidence. Id. "[U]nless an ALJ makes a finding of malingering based on affirmative evidence thereof, he or she may only find an applicant not credible by making specific findings as to credibility and stating clear and convincing reasons for each." Robbins v. Soc. Sec. Admin., 466 F.3d 880, 883 (9th Cir. 2006).

      The ALJ found Snow not entirely credible because the objective medical record and other evidence did not support her assertions. Snow believed that her symptoms developed from inhalation of chemicals, but OSHA air testing revealed no detectable chemicals in the work environment. Dr. Burton concluded that her theory about exposure through inhalation was "implausible[.]" Tr. 23, 239. Her reported experience with "anaphylaxis" was not "medically realistic." Tr. 23, 302. There was no objective evidence Snow had breathing problems or that her skin problem was something other than psoriasis. Additionally, the examinations of doctors Storrs and Burton, while Snow was still working, are consistent with Dr. Brewster's evaluation, which occurred after Snow had stopped working, undermining Snow's assertion that her condition worsened over the years.

Page 17 - OPINION AND ORDER

The ALJ provided clear and convincing reasons for finding Snow's symptoms not as severe as she reported. Although the ALJ cannot reject subjective pain testimony solely because it was not fully corroborated by objective medical evidence, medical evidence is still a relevant factor in determining the severity of the pain and its disabling effects. Rollins v. Massanari, 261 F.3d 853, 857 (9th Cir. 2001). In addition, Snow's reports about not seeking treatment after purportedly experiencing anaphylaxis, a condition which requires immediate care with death as a potential outcome, was not "medically realistic." Tr. 23, 302. Such inconsistencies between severity of symptoms and medical treatment are sufficient to support the ALJ's credibility determination. Batson, 359 F.3d at 1196. The ALJ's credibility determination was proper.

## CONCLUSION

The findings of the Commissioner are based upon substantial evidence in the record and the correct legal standards. For these reasons, the court affirms the decision of the Commissioner.

IT IS SO ORDERED.

DATED this ___9th___ day of September, 2011.


       /s/ Garr M. King
      Garr M. King
      United States District Judge